STATE of Missouri, Respondent,

v.

Timothy L. WARD, Appellant.

No. WD 68614.

Missouri Court of Appeals,
Western District.

Oct. 21, 2008.

Rosalyn Koch, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Shaun Mackelprang and Linda Lemke, Office of Attorney General, Jefferson City, MO, for respondent.

RONALD R. HOLLIGER, Judge.

Timothy Ward (hereinafter "Ward") appeals convictions after a jury trial on charges of assault on a law enforcement officer in the first degree and damage to jail property. Ward contends the evidence was insufficient to support the assault conviction because it did not prove intent to cause serious physical injury to a deputy sheriff. Ward also argues there was insufficient evidence to show that he damaged jail property or that he promoted or furthered the commission of the offence by his cell mate, Eddie Williams. We affirm the assault conviction because the evidence and reasonable inferences therefrom support conviction by a reasonable juror. We reverse the damage to jail property conviction because any inference that Ward, and not Williams, committed the act would be speculative, and there was no evidence indicating Ward promoted or furthered commission of the offence by Williams. Ward does not appeal his conviction of attempt-

ing to escape confinement at the Lafayette County jail.

### Factual and Procedural Background

Ward and Eddie Williams occupied cell B–7 in the Lafayette County jail in 2006. The jail was organized into several "pods," each containing several cells shared by two inmates and a central area with tables where inmates could spend time during the day. The inmates were required to lock themselves in their cells at 11:00 each night, absent permission to be out longer to perform cleaning duties.

Around 2:30 one morning, Deputy Josh Doss, the only deputy on duty, was delivering laundry to B pod when he heard a voice within the pod say, "Doss, can you let me in my cell?" No inmate had permission to be out. There was an intercom system that allowed any inmate who had been locked out of his cell to call an officer to let him in, but no such call had been made. Doss, who was armed with a holstered, loaded gun, proceeded down the stairs leading into the pod. Doss held a master key that opened all doors between a cell and the street outside. He saw Ward hiding under the stairs, and, with Ward behind him, proceeded to unlock cell B–7 to let Ward in. Williams was inside the cell, apparently asleep in his bunk.

As Doss approached the door to B–7, Williams suddenly and unexpectedly jumped down from his bunk and went to the windowed cell door. Doss ordered Williams to step back, and Williams complied. However, when Doss turned the key, Williams rushed to the door and began pushing it open. At the same time, Ward began punching Doss with his closed fist, about twice in the head and three times in the back. According to Doss, the first punch "rang [his] bell, just kind of disoriented [him] a little bit." The first punch was "very hard" in the back of the head, and almost knocked Doss into the door. After that, his adrenaline was going, and he described subsequent punches as "tapping coming from behind." The punches to the back were to the muscle near Doss's shoulder blade.

Meanwhile, Doss managed to force the door closed against the force of Williams, and the door locked automatically. Doss then elbowed Ward hard in the face and chest and broke free of him. He then withdrew his gun and ordered Ward to lay on the floor with his hands and feet spread. Ward refused and, according to Doss, said, "I told you I was going to get you, you punk bitch." At no time did Ward attempt to get Doss's gun. Doss was able to subdue him and transfer him to a holding cell in another part of the jail. Ward then began yelling and screaming, so Doss took him back to cell B–7. However, Ward then began pushing intercom buttons and continued yelling and screaming, so he was returned to a holding cell.

Later that morning, officers went to cell B–7 to conduct a search. They discovered that Williams had flooded the cell by blocking a drain. They told Williams to clean up the mess and he refused. Officers then searched the cell. In the top bunk, which was Ward's, they found a torn piece of prison blanket owned by Lafayette County inside a t-shirt. The piece was between 15 and 30 inches long and about two inches wide. The remaining piece of the blanket was found rolled into a ball in Williams' bunk, and had been shaped into a noose. These items were found at around 11:00 A.M., eight hours after the attack on Doss.

A few weeks later, while Ward was in a holding cell and isolated from the other prisoners, an officer performed a routine search of Ward's cell. He found a twenty inch braided rope, with loops at each end, made from a t-shirt belonging to Ward.

When questioned, Ward said it was a clothesline, but the inmates did not do their own laundry, and an officer testified the rope was insufficient for that use.

Several months later, Ward was in a holding cell when he spontaneously began shouting loudly. The officer on duty conferred with his superiors and they decided to record Ward's statements. According to the officer, at one point in the four hour recording, Ward stated, "You need to ask Josh Doss that night what happened when I kicked his motherfucking ass. And if I would have got his gun I would have killed him. Matter of fact, I would have killed everyone else in here." This part of the recording was later played for the jury.

An inmate named Crystal Hughes, also known as Cotton Candy, received several letters from someone who signed his name "Young G," "G Unit," or "G" on various occasions. These letters were addressed to "CC" and had been passed to her through a door that connects B pod to D pod, where Hughes resided. A deputy testified that Ward goes by the nicknames, "G Unit, G, Young G, [and] Little G." She also identified the handwriting on a letter as Ward's. One letter contained the following:

> Dear CC. Why are you arguing with that woman? Is it worth it? We have bigger problems. I hope she doesn't know what I'm planning on because I really don't need her knocking mine or snitching or something.... CC, I know that this shit sounds crazy but I got to bounce now. But I can't leave you all behind, so now I'm contemplating my next action. Me and Ed caught a case together so I got to ride for him, and me and you got some personal shit going on, so I got to ride for you. That shit that went down with me and Doss, it was supposed to happen then, but Ed ain't playing it right. Plus it was the perfect time. I was whipping the shit out of him too, but now I know that he knows that I ain't no fake ass nigger. I'm a motherfucking rider. My only concern is that you all be ready, man, because I got this. It's too much money out here and I missed a lot of it being in here.... Me and Eddie got big plans for this year and so do we. But we can't do nothing locked up, so what is the deal? I'll set this motherfucker off.... So let me know what is up so I can move....

Another letter reads, in part:

> To answer your questions, yes, we will be together. No, I don't plan on being here when you going to DOC. I'm ready to shake now but I'm trying to see where Ed's head is. I'm not doing any time. Fuck the police. By the time they try to get hip to me I'll be somebody else.... As soon as I get work from Ed on paper that the game is on, I'm out.... So make sure Ed writes me today because it feels good outside and I'm tired of waiting.... Young G.

Ward was charged with attempted escape from confinement, damaging jail property, and first degree assault on a law enforcement officer. During his jury trial, Ward moved for judgment of acquittal at the close of the state's evidence. He argued there was insufficient evidence to show he had anything to do with the damage to the blanket or that he attempted to kill or seriously injure Doss. The motion was overruled. Ward was found guilty of all three counts. He appeals the damage to jail property and attempted assault convictions.

### Standard of Review

In reviewing a challenge to the sufficiency of the evidence, our review is limited to a determination of whether there is sufficient evidence from which a reasonable

juror might have found the defendant guilty beyond a reasonable doubt. *State v. Clay,* 975 S.W.2d 121, 139 (Mo. banc 1998). We accept as true all evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *Id.* However, we will not supply missing evidence or give the state the benefit of unreasonable, speculative or forced inferences. *State v. Whalen,* 49 S.W.3d 181, 184 (Mo. banc 2001). We do not weigh the evidence; rather, we determine whether it is sufficient to support conviction. *State v. McCleod,* 186 S.W.3d 439, 443 (Mo.App. W.D.2006).

### Discussion

■ "A person commits the crime of assault of a law enforcement officer ... in the first degree if such person attempts to kill or knowingly causes or attempts to cause serious physical injury to a law enforcement officer...." Section 565.081.1 [1] . Ward's first point alleges there was insufficient evidence to support a finding that Ward attempted to cause serious physical injury to Doss. "Serious physical injury" means "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." Section 556.061(28). "A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense. A 'substantial step' is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the

commission of the offense." Section 564.011.1.

Therefore, we will affirm the conviction if a reasonable juror might have found that Ward's conduct strongly corroborated the firmness of his purpose to kill or cause serious injury to Doss.

Both parties cite *State v. Chambers,* 998 S.W.2d 85, 90 (Mo.App. W.D.1999) for the proposition that assault in the first degree "requires proof of a very specific intent on the part of the actor to cause serious physical injury." [2] We note that this is true only where, as here, the jury was instructed only as to *attempted* assault. To convict the defendant of the completed (substantive) offense, the state need only prove he acted "knowingly." Sections 565.081.1, 565.050.1.

■ Ward states that the "only concrete suggestion" that Ward intended serious injury comes from his recorded statement, months after the attack, that he would have killed Doss and others. In support of this argument, Ward argues that his statement that he would have killed Doss and everyone else if he had gotten Doss's gun, made nine months after he attacked Doss, is not legally competent evidence of Ward's state of mind months earlier. We disagree. "[T]he necessary intent may be based upon circumstantial evidence or inferred from surrounding facts, such as evidence of defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct." *Chambers,* 998 S.W.2d at 90 (citation omitted). While Ward's after-the-fact statements are not direct evidence of his mindset at the time

---

1. All statutory citations are to RSMo 2000, updated through RSMo Cum.Supp.2007.

2. The *Chambers* court was not construing section 565.081.1, but rather section 565.050.1, which reads, "A person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person." Aside from sentencing considerations, the only difference between the two offenses is the identity of the victim, and our analysis of the other elements applies to both statutes.

of the attack on Doss, they are competent circumstantial evidence upon which the jury could have based its verdict. Moreover, the evidence of Ward's intent is more extensive than he acknowledges.

A reasonable inference is that Ward and Williams planned to escape confinement. This is supported by the coordinated attack on Doss, the making of weapons which could have incapacitated or killed Doss, Ward's statements months later that he would have killed Doss and others, and especially by Ward's letters to Hughes, which plainly speak of Ward's intent to escape.

Another reasonable inference is that an incapacitating attack on Doss was central to the escape plan. Doss held a master key that would allow the inmates to completely escape. Ward lied in wait for Doss to enter the pod, and Williams was clearly prepared to aid in the attack and escape when he suddenly rushed the door. The rope and noose had no purpose except to incapacitate or kill someone. Moreover, Ward later made statements indicating he would have killed Doss if he had gotten his gun. His letters to Hughes indicates that the attack on Doss was central to the escape plan. In particular, in discussing his intent to "ride," Ward wrote, "That shit that went down with me and Doss, it was supposed to happen then, but Ed ain't playing it right. Plus it was the perfect time. I was whipping the shit out of him too."

These inferences are not unreasonable, speculative, or forced. As such, a reasonable juror could conclude that Ward acted with the very specific intent to cause "serious disfigurement or protracted loss or impairment of the function" of Doss's body, if not to cause his death, in order to escape confinement. Section 556.061(28).

Point I is denied.

■ Ward next challenges the sufficiency of the evidence as to destruction of the jail blanket. The jury was instructed to find Ward guilty of damage to jail property if, "with the purpose of promoting or furthering the commission of [the] damage to jail property, the defendant acted alone or acted together with or aided Eddie Williams in committing the offence." The substantive offense requires that the defendant "knowingly damages any city or county jail building or other jail property." Section 221.353.1.

Ward points out that Williams, who was locked in cell B–7 alone, had sole access to the blanket between 2:30 A.M. and 11:00 A.M., when the torn blanket was found. He argues that this is the sum total of the evidence on this charge, and it is therefore insufficient for conviction.

The state counters that Ward took the lead in planning an escape which *may* have involved the noose and rope fashioned from the blanket. It also points to Ward's making of a "braided rope" a few weeks later, out of his own property, and suggests this is probative of his damage to the jail blanket. The state creates a scenario in which Williams and Ward, while executing their planned escape, "could use their blanket—weapons to overpower and bind [Doss] and take his gun." While this would be a reasonable inference from the evidence presented, we do not think an inference that it was Ward, and not Williams, who damaged the jail blanket is anything short of speculation.

The state also suggests that Williams would have had only about ninety minutes to make the weapons, not eight hours as suggested by Ward, because officers could look into his cell through the cameras, and Williams spent part of the morning contriving to flood his cell. However, the blanket could have been torn prior to the attack on Doss; the act need not have been done during the window of time when Williams occupied the cell alone. As Ward

states in his reply brief, "[t]here is no way to know who tore the [blanket] or when it was torn." It is obvious that either Ward or Williams tore it. But to pick one would be speculation.

Nor is there any evidence of any purpose by Ward to promote or further the commission of the offense by Williams. The state argues, "[t]he fact that they acted together during the escape attempt allows a reasonable inference that they acted together in making the weapons to be used during the escape." However, unlike the inference that the escape plan and punching of an officer are probative of intent to cause serious bodily injury, an inference that the escape plan shows intent by Ward to help Williams tear a blanket into pieces is speculative. At best, the escape plan shows Ward's motive for making weapons. There is no evidence indicating any action by Ward that constitutes destruction of jail property. Even if Ward's subsequent fashioning of a braided rope out of a t-shirt increases the likelihood that he made a noose out of the torn blanket, it does not have any bearing on whether or not Williams was the actual perpetrator.

Therefore, the evidence presented at trial was insufficient to support conviction on damage to jail property.

### Conclusion

The conviction on the charge of assault on a law enforcement officer in the first degree is affirmed. We reverse the conviction on the charge of damage to jail property.

JOSEPH M. ELLIS, Presiding Judge, and JOSEPH P. DANDURAND, Judge, concur.